**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| JAMES M. LINICK,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 1:10-cv-635<br><br>Judge Thomas C. Wheeler |

**DEFENDANT'S PROPOSED CONTESTED ISSUES OF FACTS AND CONTENTIONS OF FACT**

The Court's Order of July 26, 2011, Docket No. 20, requires each party to submit a "separate statement of contested factual issues to be addressed at trial" and the contentions that counsel expects to prove at trial. The United States provides the following issues of fact and subsidiary contentions of fact.

**Contested Issue of Fact No. 1: Whether James M. Linick has suffered "damage" which is cognizable under 35 U.S.C. § 183.**

1. James M. Linick ("Mr. Linick") brought this action pursuant to 35 U.S.C. § 183 seeking compensation for alleged damage caused by imposition of an order of secrecy pursuant to 35 U.S.C. § 181. (Compl.).

2. The patent applications at issue in this case relate to what Mr. Linick refers to as "Trajectory Correctable Munitions" or "TCM."

3. Three applications are at issue:

a. Application Serial No. 10/071,215 (the '215 Application), which claims an orientation reference system for a munition and a method for determining the angular orientation for a munition;

b. Application Serial No. 10/584,614 (the '614 Application), which claims a "rotating munition with a spinning round"; and

c. Application Serial No. 10/584,615, which claims a specific type of cargo round incorporating an impulse motor apparatus.

### A. BACKGROUND ON JAMES M. LINICK[1]

4. Mr. Linick does not claim damages for use of the invention by the Government. (Compl.).

5. Mr. Linick is a professional engineer who holds multiple United States patents relating to munitions technologies. (Compl.)

6. In about 1963-1965, Mr. Linick sold an invention relating to individually frozen shrimp to Westinghouse. (Def. Ex. 76 at 14:18-15:1).

7. Mr. Linick then spent much of his time working with infrared technology. (Def. Ex. 76 at. 15:2-10).

8. Mr. Linick made "a lot of inventions on a lot of subjects." (Def. Ex. 76 at. 12:19-13:6).

9. Mr. Linick sold one or more inventions relating to a Forward-Looking Infrared (FLIR) system to Rexham Aerospace, a British company in about 1988. (Def. Ex. 76 at. 12:19-14:17).

10. Patents that were issued to Mr. Linick before he developed his TCM inventions include:

---

[1] The subheadings are provided only to assist the Court by providing guidance as to the organization of the contentions of fact.

- U.S. Patent No. 4,886,330, for an "infra-red imaging system," filed June 30, 1987 (Def. Ex. 5);

- U.S. Patent No. 4,679,748, for a "cannon-launched projectile scanner," filed June 25, 1984 (Def. Ex. 4);

- U.S. Patent No. 4,453,087, for a "scanning mechanism for FLIR systems," filed July 27, 1981(Def. Ex. 3);

- U.S. Patent No. 4,407,464, for a "steering mechanism for a thermal imaging system and rangefinder therefor," filed July 27, 1981 (Def. Ex. 2); and

- U.S. Patent No. D247,615 for a medallion design, filed Jan. 21, 1976 (Def. Ex. 1).

11. In about 1988 to 1991, Mr. Linick consulted with Teledyne Brown Engineering, providing engineering opinions on whether a tank sight that Teledyne was building for the government would work. (Def. Ex. 76 at 15:11-16:9).

12. While he was consulting for Teledyne, a Teledyne employee took Mr. Linick to meet an employee of Contraves, a subsidiary of Orelikon-Buhrle Group, a Swiss corporation. (Def. Ex. 76 at 17:17-18:22).

13. Subsequently, while Mr. Linick lived in Switzerland, he consulted with Contraves in relations to a fire control system called "Fieldguard" that Contraves was interested in selling. (Def. Ex. 76 at 17:21-20:11).

14. While evaluating how to improve the accuracy of the Fieldguard system when used with a Multiple-Launch Rocket System (MLRS), Mr. Linick determined that it would be easier to improve the accuracy of the MLRS rocket rather than to rebuild the Fieldguard system completely. (Def. Ex. 76 at 20:6-21:8)

15. Mr. Linick's realization led to idea for Trajectory Correctable Munitions. (Def. Ex. 76 at 20:6-21:8).

16. Contraves was not interested in his approach because it did not make the MLRS weapon system, only the fire control system. (Def. Ex. 76 at 20:6-21:8).

17. Mr. Linick then obtained a Swiss patent, No. 674,587 on his early idea for a Trajectory Correctable Munition. (Def. Ex. 76 at 20:6-21:8).

18. Patents that have been issued to Mr. Linick for Trajectory Correctable Munitions include:

- U.S. Patent No. 6,722,609, for an "impulse motor and apparatus to improve trajectory correctable munitions including cannon launched munitions, glide bombs, missiles, rocket and the like," filed Feb. 13, 1998 (Def. Ex. 9);

- U.S. Patent No. 5,988,562, for a "system and method for determining the angular orientation of a body moving in object space," filed Nov. 5, 1997 (Def. Ex. 8);

- U.S. Patent No. 5,647,558, for a "method and apparatus for radial thrust trajectory correction of a ballistic projectile," filed May 1, 1995 (Def. Ex. 7); and

- U.S. Patent No. 5,131,602, for an "apparatus and method for remote guidance of cannon-launched projectiles," filed June 13, 1990 (Def. Ex. 6).

19. Mr. Linick has only licensed three patents related to Trajectory Correctable Munitions : Swiss Patent No. 674,587, and United States Patents No. 5,647,558 (the '558 patent) and No. 5,131,602 (the '602 patent).

20. All three of these patents (the Swiss '587, '558 and '602 patents) were licensed to Bofors Weapon Systems Division of Bofors AB of Sweden. (Def. Ex. 100, Ans. to Interrog. No. 9).

### B. U.S. PATENT NO. 4,679,748.

21. On June 25, 1984 Mr. Linick and Åke Blomqvist filed an application for a United States patent, which was assigned Application No.06/624,631 by the United States Patent and Trademark Office (PTO). (Def. Ex. 4).

22. The '631Application[2] claims priority from a Swedish application filed on July 5, 1983. U.S. Patent No. 4,679,748 (Def. Ex. 4).

---

[2] Herein the Government shortens references to the patent applications and issued patents, by using the common short form: an apostrophe followed by the last three digits of the

23. The ‘631Application issued as the United States Patent No. 4,679,748 on July 14, 1987 and expired on July 14, 2007. U.S. Patent No. 4,679,748 (Def. Ex. 4).

24. The ‘748 Patent claims a cannon-launched projectile having a radar guidance systems to alter the direction of flight. U.S. Patent No. 4,679,748, claim 1 (Def. Ex. 4).

### C. U.S. PATENT NO. 4,886,330.

25. On April 7, 1988, Mr. Linick filed an application for a United States patent, which was assigned Application No. 07/188,396 by the PTO. (Def. Ex. 5).

26. The ‘396 Application claims priority to a Swiss patent application that was filed on August 7, 1986. U.S. Patent No. 4,886,330 (Def. Ex. 5).

27. The ‘396 Application issued as U.S. Patent No. 4,886,330 on December 12, 1989 and expired on June 30, 2007. (Def. Ex. 5).

28. The ‘330 Patent claims an infra-red imaging system useful in searching object space for potential targets. U.S. Patent No. 4,886,330 (Def. Ex. 5).

29. Mr. Linick has not licensed the ‘330 Patent.

### D. U.S. PATENT NO. 5,131,602.

30. On June 13, 1990, Mr. Linick’s filed a patent application, which was assigned Application No. 07/537,296 by the PTO. (Def. Ex. 6).

31. The ‘296 Application issued as United States Patent No. 5,131,602 on July 21, 1992 and expired on June 13, 2010. (Def. Ex. 6).

32. The ‘602 Patent claims an apparatus and method of remotely guiding a ballistic projectile that comprises a ground-based subsystem and a sub-system in the projectile that communicates with the ground-based subsystem for the purpose of

---

application or patent number and the type of document (*i.e.*, Application or Patent).

correcting the trajectory of the projectile. United States Patent No. 5,131,602, claim 1. (Def. Ex. 6).

33. Mr. Linick assigned the ‘602 Patent to Bofors AB of Karlskoga, Sweden.

### E. U.S. PATENT NO. 5,647,558.

34. On February 14, 1995, Mr. Linick’s filed a patent application, which was assigned Application No.08/388,039 by the PTO. (Def. Ex. 7).

35. On May 1, 1995, Mr, Linick filed Application No. 08/431,761 as a continuation in part of the ‘039 Application. (Def. Ex. 7).

36. After filing the ‘761 Application, Mr. Linick abandoned the ‘039 Application. (Def. Ex. 7).

37. The ‘761 Application issued as U.S. Patent No. 5,647,558 on July 15, 1997. (Def. Ex. 7).

38. United States Patent No. 5,647,558 claims a system for controlling the placement of an airborne vehicle comprising *inter alia* a means for determining a vertical reference for the vehicle, a computer for determining the correct trajectory and an impulse motor for imparting thrust to change the trajectory. United States Patent No. 5,647,558, claim 1. (Def. Ex. 7).

39. On April 26, 1995, Mr. Linick assigned the ‘558 Patent to Bofors AB, a Swedish Company.

### F. UNITED STATES PATENT NO. 5,998,562

40. On November 5, 1997, Mr. Linick filed a patent application, which was assigned Application No. 08/964,792 by the PTO. (Def. Ex. 8).

41. The ‘792 Application issued as United States Patent No. 5,988,562 on November 23, 1999 and will expire on November 5, 2017. (Def. Ex. 8).

42. The ‘562 Patent claims an orientation reference system for determining the angular orientation of a body moving in object space comprising a means for

generating a signal in proportion to the angle of attack and a means for processing that signal "determine a time when the body has a predetermined angular relationship with the plane of gravity. United States Patent No. 5,998,562, claim 1. (Def. Ex. 8).

### G. UNITED STATES PATENT NO. 6,722,609 B2

43. One February 13, 1998, Mr. Linick filed a patent application, which was assigned Application No. 09,023,118 by the PTO. (Def. Ex. 9).

44. The '118 Application issued as U.S. Patent No. 6,722,609 on April 20, 2004. (Def. Ex. 9).

45. The '609 Patent claims a munition having an impulse motor for correcting the munition's trajectory in-flight. (Def. Ex. 9).

### H. NO MODIFICATION OF SECRECY ORDERS

46. Mr. Linick never attempted to modify the secrecy order in order to market the inventions claimed in the '215, '614 and '615 Applications. (Def. Ex. 77 at 266).

47. Mr. Linick never sought permission to market his inventions to U.S. government contractors. (Def. Ex. 77 at 266).

48. Mr. Linick never attempted to modify the secrecy order to market the inventions to foreign governments or foreign government contractors. (Def. Ex. 77 at 266).

**Contested Issue of Fact No. 2: Whether any "damage" suffered by Mr. Linick was "caused by the order of secrecy."**

49. Mr. Linick has only successfully licensed two patents, United States Patents No. 5,647,558 (the '558 patent) and No. 5,131,602 (the '602 patent).

50. Both the '558 and '602 patents were licensed to Bofors Weapon Systems Division of Bofors AB of Sweden. (Def. Ex. 100 at Ans. to Interrog. No. 9).

51. According to Mr. Linick, consulting engineering business opportunities arise quickly and dissipate with the same rapidity. By this, Mr. Linick meant that an entity could express interest in his technology, but after he had visited the entity, they may say “thank you and good-bye” and he would never hear from the entity again. (Def. Ex. 106 at 11:9-12:13).

### A. EXCALIBUR

52. The Department of the Army (Army) has developed and is continuing to develop a family of munitions known as Excalibur. (Def. Ex. 77 at 232).

53. Excalibur was developed by the Army as part of an international project with Sweden. (Def. Ex. 109)

54. Bofors AB, now a subsidiary of BAE Systems, participated in the development of the Excalibur munitions on behalf of Sweden.

55. The Excalibur munitions are precision, autonomously guided, artillery rounds with extended range.

56. The Excalibur munitions use a global positioning system technology for guidance.

57. The Excalibur munitions do not infringe any of Mr. Linick’s patents or patent applications. (Def. Ex. 77 at 231:18-212-11).

### B. PRESENTATION TO PICATINNY ARSENAL

58. Mr. Linick unsuccessfully attempted to market the technology described in patent application 10/071,215 to the United States Army Armament Research, Development and Engineering Center (ARDEC) at Picatinny Arsenal in 1999. (Def. Ex. 76 at 59-60; Def. Ex. 100, Ans to Interrog. No. 9).

59. The attempt to market the technology to ARDEC occurred prior to the imposition of the secrecy order.

60. Mr. Linick met with Vincent P. Marchese, Modesto J. Barbarisi, and John F. Moran on July 27, 1999. (Def. Ex. 33-35 at 232).

61. The purpose of the meeting was "[t]o introduce James Linick to appropriate Government personnel to ensure that Linick inventions are made available to Government and to obtain Government advice as to how best to proceed with Linick inventions." (Def. Ex. 33).

62. The government personnel at Picatinny Arsenal at the meeting on July 27, 1999 "seemed disinterested" and "had no interest in what [Mr. Linick] had to show them." (Def. Ex. 76 at 58).

63. The government personnel at Picatinny Arsenal at the meeting on July 27, 1999 told Mr. Linick that they were working on other things "like Excalibur." (Def. Ex. 76 at 58).

64. After the meeting, the government personnel at Picatinny never asked to see Mr. Linick again. (Def. Ex. 76 at 58).

65. Prior to the secrecy order, Mr. Scott offered to provide additional information to the Army. (Def. Ex. 40).

66. The Army did not request additional information in response to Mr. Scott's offer.

### C. CONGRESSMAN WELDON

67. After the meeting at Picatinny Arsenal, Mr. Scott and Mr. Linick visited Congressman Weldon's office. (Def. Ex. 76 at 60).

68. Mr. Linick was never contacted by Congressman Weldon's office after their meeting. (Def. Ex. 76 at 60).

### D. ALLIANT TECHSYSTEMS

69. On July 26, 1999, Mr. Scott sent Alliant Techsystems Inc. an outline of Mr. Linick's inventions. (Def. Ex. 36).

70. Mr. Linick unsuccessfully attempted to market patent application 10/071,215 to Alliant Techsystems. (Def. Ex. 100, Ans to Interrog. No. 9).

71. Prior to the imposition of the secrecy order, Alliant informed Mr. Scott that, after review of Mr. Linick's inventions, Alliant Techsystems was not interested in his inventions. (Def. Ex. 36).

### E. LOCKHEED MARTIN CORPORATION

72. In October-November 1999, Mr. Linick unsuccessfully attempted to market the inventions described in Application No. 10/071,215 to Lockheed Martin Corporation. (Def. Ex. 76 at 61-62; Def. Ex. 100, Ans to Interrog. No. 9).

73. In the meeting at Lockheed Martin, after Mr. Linick described why he "didn't think [Excalibur] was a very good round", the Lockheed Martin employees "broke into genuine laughter." (Def. Ex. 76 at 62).

74. Lockheed Martin "wasn't interested" in Mr. Linick's inventions and the "meeting lasted about ten minutes." (Def. Ex. 76 at 62).

75. Lockheed Martin indicated to Mr. Scott that "[s]hort range munitions for the 105mm and 155mm howitzers are not its present goal or in its current plan." (Def. Ex. 55).

### F. ARMY ARTILLERY CENTER, FORT SILL

76. Mr. Scott wrote a letter to Major General Toney Stricklin, Commanding General of the United States Army Field Artillery Center at Fort Sill, Oklahoma on February 10, 2000. With the letter, Mr. Scott provided materials "with respect to his concepts for sensing and correcting the trajectory of a standard artillery shell." (Def. Ex. 42).

77. In April 2000, Major General Stricklin had personnel at Artillery School and Center review Mr. Linick's proposal. (Def. Ex. 44).

78. After completion of the review, Major General Stricklin told Mr. Scott that the "analysis of Mr Linick's proposal resulted in concerns about [the Army's] ability to mass fires, frequency interference avoidance, and platform integration/weaponization challenges associated with a ground based sub-system." (Def. Ex. 44).

79. Mr. Linick sent a proposal to Rheinmetal Weapons and Ammunition at Ratingen, Germany. (Def. Ex. 77 at 248; Def. Ex. 44; Def. Ex. 100, Ans to Interrog. No. 9).

80. Although there were several conversations and communications between Mr. Scott and Major General Toney Stricklin, Linick never visited or gave a presentation at Fort Sill in 2000 or later. (Def. Ex. 77 at 230).

### G. DISCUSSIONS WITH RHEINMETAL

81. Although Mr. Linick proposed a meeting to explain aspects of the vertical reference system and forwarded a non-disclosure agreement, Mr. Linick never visited or gave a presentation at Rheinmetal Weapons and Ammunition at Ratingen, Germany. (Def. Ex. 77 at 248, Def. Ex 51; Def. Ex. 100, Ans. to Interrogatories No. 9).

### H. DISCUSSIONS WITH THE DIEHL GMBH

82. On February 19, 2001, Mr. Linick met with Dr. Christian Klee of DIEHL Munitionssyteme, GmbH & Company in Germany at Mr. Linick's expense. (Def. Ex. 56; Def. Ex. 76 at 72:13-73:22).

83. Mr. Linick's meeting with Dr. Kell particularly related to the '562 Patent. (Def. Ex. 76 at 73).

84. DIEHL would not cover Mr. Linick's travel expenses and seemed "noncommittal." (Def. Ex. 76 at 73).

85. The engineers at Diehl seemed "pretty irritated" because Mr. Linick did not leave them any documentation. (Def. Ex. 76 at 73).

86. Mr. Linick testified that the reason he did not leave information "wasn't because of any secrecy order … they were very bright engineers that [he] met with and … it wouldn't [have been] an intelligent thing for [him] to leave them designs or anything like that." (Def. Ex. 76 at 73).

87. On March 1, 1999, Mr. Linick sent a letter and a work proposal to Diehl. (Def. Ex. 56; (Def. Ex. 77 at 248:7-253:11);

88. Mr. Linick's offer was never accepted and Mr. Linick did not return to Germany after the letter to meet with Diehl. (Def. Ex. 77 at 248:7-253:11).

89. There was no secrecy order pending at the time of Mr. Linick's meeting with Diehl. (Def. Ex. 76 at 77).

90. Mr. Linick's proposal to work with Diehl Munitionssyteme, GmbH & Co. was not accepted. (Def. Ex. 77 at 250-252; Def. Ex. 100, Ans to Interrog. No. 9).

### I. MARINE CORPS WARFIGHTING LABORATORY

91. Mr. Scott asked one of the other partners at his law firm, Fred Graefe, to contact the Marine Corps Warfighting Laboratory at Quantico Marine Base on Mr. Linick's behalf. (Def. Ex. 62, 64, 66; Def. Ex. 77 at 204:18-212:9).

92. Mr. Graefe provided the Marine Corps with information regarding Mr. Linick's Inventions. (Def. Ex. 62, 64, 66; Def. Ex. 77 at 204:18-212:9).

93. Prior to the imposition of the secrecy order in July 2002, Mr. Forrest R. Lindsey, a senior engineer with the Technology Division of the Marine Corps wrote Mr. Scott, indicating that Mr. Lindsey did not believe Mr. Linick's technology would be successful and that Mr. Linick did not have the data to back up claims of accuracy or cost. (Def. Ex. 63).

94. Shortly after imposition of the secrecy order, on or about August 5, 2002, Mr. Lindsey indicated that he did not believe Mr. Linick had overcome engineering challenges to implement his ideas. (Def. Ex. 66).

95. Mr. Lindsey responded to Mr. Scott providing his analysis of Mr. Linick's concepts and closed the e-mail by stating "I still don't understand how [Mr. Linick] overcomes some of these engineering challenges to implementing his ideas. The concepts he describes in his patents and discussions appear to have more applicability to aircraft bombs, fin-stabilized rockets, or possibly smoothbore mortar projectiles rather than rifled artillery projectiles." (Def. Ex. 66).

96. Mr. Lindsey offered to discuss the concepts further. (Def. Ex. 66).

97. Mr. Linick was ill at the time and did not further pursue Mr. Lindsey's offer. (Def. Ex. 76 at 81:15-22; Def. Ex. 77 at 206:13-207:17).

98. Mr. Linick stated that there could be no assurances that his inventions would result in an accuracy of ten meters or five meters. (Def. Ex. 76 at 64:19-67:10)

99. Mr. Linick believed the relative expense of Mr. Linick's invention was a magnitude of ten times lower than the Excalibur-type trajectory. (Def. Ex. 76 at 67).

100. After reviewing a summary of Mr. Linick's inventions provided to Mr. Fred Graefe, the United States Marine Corps did not believe the ideas were cost-effective. (Def. Ex. 100, Ans to Interrog. No. 9; Def. Ex. 62).

### J. LITTON INDUSTRIES

101. In 2000, Mr. Linick met with representatives of Litton Guidance. (Def. Ex. 76 at 62:20-64:6).

102. Litton informed Mr. Linick that "they weren't interested in manufacturing or producing any ammunition for the government or getting involved in a program that would be, say, competitive with an already existing program which was called Excalibur, which was a very important program to the government at that time …." (Def. Ex. 76 at 62:20-64:6).

103. Mr. Linick's technology "would be completely competitive to [Excalibur]." (Def. Ex. 76 at 62:20-64:6).

### K. TALLEY INDUSTRIES

104. In July of 2000, Mr. Scott contacted Mr. George Poole of Talley Industries Inc. regarding Mr. Linick's inventions. (Def. Ex. 45-46).

105. To Mr. Linick's knowledge, Talley Industries, at the time, was only trying to make gun barrels that would be useful on the Bradley fighting vehicle. (Def. Ex. 77 at 255:5-22).

106. Mr. Linick stated that his inventions “had nothing to do with anything they were doing. Zero.” (Def. Ex. 77 at 255:5-22).

### L. GOVERNMENT OF THAILAND

107. On March 25, 2005, Mr. Scott sent Colonel Naretrak Thitathan of the Royal Thai Embassy, a letter providing information about Mr. Linick’s patents, and requesting a meeting with a representative from Thailand’s Ministry of Defense. (Def. Ex. 70).

108. In 2005, Mr. Linick met with the two officials of the government of Thailand. (Def. Ex. 76 at 88).

109. The Thai officials were not interested in his patents, but “interested in [Mr. Linick] teaching courses in Thailand.” (Def. Ex. 76 at 88).

### M. GOVERNMENT OF INDIA

110. Mr. Linick had conversations with representatives from the Indian government. Those conversations never progressed to a sale. (Def. Ex. 77 at 263).

111. Mr. Linick told that Indian officials that he could develop a “statement of work,” after Mr. Linick asked questions about the Indian GPS system, the officials “wouldn’t talk to [him] at all. Not even an iota about the GPS system.” (Def. Ex. 76 at 92).

112. Mr. Linick did not have “any interest to follow up on it in [light of the Indian governments’] various arguments with their neighbor like Pakistan.” (Def. Ex. 76 at 93:1-5).

113. If Mr. Linick had entered into a patent acquisition contract with the Indian Government, Linick would have expended $300,000.00 (three hundred thousand dollars) in engineering services and support and $500,000.00 (five hundred thousand dollars) in travel and legal fees. (Def. Ex. 100, Ans. to Interog. No. 15).

114. There are very few countries in the world that had both the means to make the product and the money to make the product. (Def. Ex. 76 at 105).

### N. GOVERNMENT OF ISRAEL

115. On February 15, 2004, Mr. Scott contacted Dr. Kenneth E. DeGrafenried, who Mr. Scott believed had connections with the Government of Israel or the Israeli Defense Forces and provided him with information re Mr. Linick's invetnions. (Def. Ex. 68; Def. Ex. 104 at 80:11-82:19).

116. Dr. DeGrafenried probably provided a response to Mr. Scott, but Mr. Scott could not remember receiving a response, how the response was provided or whether Mr. Grafenried put Mr. Scott in touch with representatives of the Israeli government. (Def. Ex. 68; Def. Ex. 104 at 80:11-82:19).

117. On February 16, 2004, Mr. Scott contacted Mr. Anthony Codevilla, who Mr. Scott believed had connections with the Government of Israel and provided him with information regarding Mr. Linick's inventions. (Def. Ex. 69; Def. Ex. 104 at 82:20-84:12).

118. Mr. Codevilla did not respond to Mr. Scott's letter because Mr. Codevilla was ill. Mr. Scott was not put in touch with the Israeli government as a result of the Codevilla letter. (Def. Ex. 104 at 82:20-84:12).

119. Mr. Linick had no contact with the Israeli Government and never authorized any contact with the Israeli Government. (Def. Ex. 106 at 10:2-11:3).

120. Mr. Linick testified: "I don't deal with nations in the – you might call it the Mid East area at all." (Def. Ex. 106 at 32:8-12).

### O. GOVERNMENT OF JAPAN

121. In April 2004, Mr. Linick had a meeting with Japanese government officials in the Japanese Defense Department. (Def. Ex. 76 at 84:17-85:18).

122. Mr. Scott sent letters to Mr. Jeff Henley, an Executive Vice President at Morgan Stanley Smith Barney on April 27, 2010 and July 15, 2010 in an attempt to provide more information on Mr. Linick's inventions to Japanese organizations. (Def. Ex. 78, 82, 83).

123. The Japanese government was not interested in Mr. Linick's technology. (Def. Ex. 76 at 84, 98-105).

### P. GOVERNMENT OF KOREA

124. During the summer of 2010, Tate Haire – a friend of Mr. Linick in Naples, Florida – gave Mr. Linick the name and phone number for Mr. Andrew Durant at Samuels International. (Def. Ex. 106 at 25:23-28:18).

125. Mr. Linick on September 7, 2010, entered into an agreement with Samuels International for the purpose of obtaining assistance in marketing his inventions to foreign governments. (Def. Ex. 87)

126. Mr. Durant arranged a meeting with representatives of the Republic of Korea. (Def. Ex. 105 at 15:17-19:21).

127. A first meeting was held in November 2010 at the offices of the Korean military attaché in Arlington, Virginia. At that meeting, the Korean representatives seemed enthusiastic and asked good questions. (Def. Ex. 105 at 19:22-20:13).

128. A second meeting was held on January 18, 2011. (Def. Ex. 94).

129. Mr. Durant testified that the second meeting had "a different dynamic." Mr. Durant and Mr. Linick were rushed because of a delay in Mr. Linick's flight from Naples, Florida and Mr. Linick's need to depart by a time certain. (Def. Ex. 105 at 20:11-21:22).

130. Mr. Durant further testified that he believed that the Koreans were "moving in a – what appeared to [him] to be a deliberate pace." (Def. Ex. 105 at 51:17-52:4).

131. On January 31, 2011, Mr. Linick terminated his agreement with Samuels International. (Def. Ex. 95).

### Q. PEOPLES REPUBLIC OF CHINA

132. On March 28, 2011, Mr. Scott sent a letter to the Embassy of the People's Republic of China in the United States on behalf of Mr. Linick. (Def. Ex. 104 at 38:11-40:17).

133. A letter from Mr. Linick and materials relating to the Linick's TRAK technology were enclosed with the original letter that Mr. Scott sent to the Chinese Embassy. (Def. Ex. 104 at 38:11-40:17).

134. Mr. Linick testified on September 15, 2011 that he does not "deal with China." (Def. Ex. 106 at 32:8-12).

135. Mr. Linick later testified that he had previously performed a consulting agreement with the Chinese Ministry of Astronautics. (Def. Ex. 97; Def. 106 at 91:17-93:6).

**Contested Issue of Fact No. 3: If damage has occurred, the date upon which the damage first accrued.**

136. Mr. Linick has not identified any entity that would have entered into a consulting agreement with him.

137. Mr. Linick has not identified any foreign government with whom he would have entered into a consulting agreement.

138. To determine the date on which damages would have accrued would require speculation both as to what entity would have hired Mr. Linick and when that consulting agreement would have started.

139. Notably, due to Mr. Linick's medical condition which began beginning in 2002 and continued for at least a year thereafter, Mr. Linick would have been unable to perform any significant consulting activity. (Def. Ex. 77 at 162).

140. In 2004 and 2005, Mr. Linick has identified contacts with the Thai, Japanese and Indian governments as attempts to consult. (Def. Ex. 100, Ans. to Interrog. No. 9).

141. Linick has not identified any activity related to his attempts to sell the patents at issue or his efforts to consult regarding the technology during 2006, 2007, 2008 or 2009.

142. Mr. Linick's inability to perform consulting activity is established by his own testimony that he was unable to meet with Marine Corps engineers and other representatives of the Marine Warfighting Laboratory in 2002. (Def. Ex. 77 at 207).

143. Similarly, Mr. Linick did not pursue sales efforts with the Army Research Laboratory and Navy Warfare Center at Dahlgren because of his health. (Def. Ex. 77 at 207).

**Contested Issue of Fact No. 4: Whether, because of medical illness,**

**(a) Mr. Linick was unable to conduct his consulting and other business ventures; and**

**(b) Mr. Linick was unable to market his intellectual property.**

144. In late 2001, Mr. Linick found out that he had leukemia.

145. At the time the secrecy order issued in 2002, Mr. Linick was not in good physical condition, and it affected his marketing because "it would be a lot of telephone calls and a lot of visits and seeing a lot of people and doing a lot of work." (Def. Ex. 77 at 162).

146. In 2002, Col. Doug Jerothe of the USMC War Fighting Lab agreed to meet with Mr. Scott or Mr. Linick. (Def. Ex. 65).

147. The proffered meeting with Col. Doug Jerothe never occurred. (Def. Ex. 77 at 207).

148. Mr. Linick did not make a presentation to the Marine Corps Warfighting Laboratory in 2002 because of his health. (Def. Ex. 77 at 207).

149. Mr. Lindsey of the Marine Corps Warfighting Laboratory suggested that Mr. Linick should contact the Army Research Laboratory and the Navy Warfare Center at Dahlgren. (Def. Ex. 63; Def. Ex. 77 at 204:17-207:17)

150. After Mr. Lindsey's suggestion, Mr. Linick did not pursue contacting the Army Research Laboratory because of his health. (Def. Ex. 77 at 207).

151. After Mr. Lindsey's suggestion, Mr. Linick did not pursue contacting the Navy Warfare Center at Dahlgren because of his health. (Def. Ex. 77 at 207).

152. During this time in 2002, Mr. Linick was very sick. (Def. Ex. 77 at 207).

153. In calendar years 2006 through 2009, Mr. Linick did not pursue any efforts to market his inventions.

154. After Mr. Linick filed this suit, he again attempted to market his inventions in 2010 and 2011.

**<u>Contested Issue of Fact No. 5</u>: If the Court finds that the order of secrecy caused damage to Mr. Linick, whether Mr. Linick has established the quantum of the compensation he claims, including**

**(a) whether Mr. Linick has established the revenue that he would have received from any intellectual property licensing agreement;**

**(b) If the Court finds that the order of secrecy caused damage to Mr. Linick, whether Mr. Linick's cost of achieving that revenue can be adequately ascertained;**

**(c) the amount of compensation that should be awarded; and**

**(d) the amount of interest, if any, that should be awarded.**

155. Mr Linick claims that the "amount of compensation due" is $ 2,500,000.00. (Compl. ¶¶ 1, 6; Def. Ex. 100, Ans. to Interrog. No. 1)

156. Mr. Linick has not entered into any agreements for the manufacture, use or sale of the “Vertical Reference System.” (Def. Ex. 100, Ans. to Interrog. No. 4).

157. Mr. Linick has not entered into any agreements for the manufacture, use or sale of the “Impulse Motor Apparatus.” (Def. Ex. 100, Ans. to Interrog. No. 6).

158. Mr. Linick has not entered into any agreements for the manufacture, use or sale of the “Red Rain Technology.” (Def. Ex. 100, Ans. to Interrog. No. 8[a]).

### A. THE BOFORS’ AGREEMENT

159. Mr Linick entered into a series of agreements with Bofors on February 20, 1995, including a “Marketing Assistance Agreement,” a “New and Improved Patent Agreement,” and a “Agreement for the Transfer of Ownership of Patents.” (Def. Ex. 13-15).

160. The “Agreement for the Transfer of Ownership of Patents” provided in pertinent part, for the transfer of the Swiss ‘587 and ‘602 patents to Bofors in return for

a. a lump sum payment of $ 2 million;

b. a 0.5% royalty on the Gross Sales Price of TCM products; and

c. 3% commission on the Gross Sales Price for U.S. Foreign Military Sales (FMS) of products incorporating TCM technology.

(Def. Ex. 14).

161. Under the 1995 “New and Improved Patent Agreement,” Mr. Linick granted Bofors the “irrevocable and exclusive right … to acquire future or improved … patents relating to the field of Trajectory Correctable cannon launched projectiles or rockets. If Bofors exercised its right “the compensation to L[inick] for such [i]mprovements shall be an increase in the 0[.]5% royalties stated in Article II(b)(1) of the Patent Transfer Agreement to an amount to be negotiated on case by case basis up to a maximum” of 2.25% of Gross Sales Provided for TCM products. Further, once the 2.25% royalty level was reached, Bofors could obtain all further improvements without any further increase in royalties. (Def. Ex. 14).

162. Under the 1995 “Marketing Assistance Agreement,” Bofors agreed to reimburse Mr. Linick’s expenses up to certain limits. Mr. Linick would not be reimbursed more than $5,000 per month without permission and in no event for expenses in excess of $25,000. (Def. Ex. 13).

163. While Mr. Linick was working with Bofors, Bofors never incorporated Mr. Linick’s invention into an actual prototype. Accordingly, Mr. Linick received the base sum of $ 2 million under the 1995 “Agreement for the Transfer of Ownership of Patents,” but has not received any additional compensation for the ‘602 patent or any other patents. (Def. Ex. 77 at 177; Def. Ex. 49)

164. Pursuant to the 1995 “New and Improved Patent Agreement,” Mr. Linick offered United States Patent Application, Serial No. 08/431,761 to Bofors. (Def. Ex. 15). On February 20, 2011, Bofors and Mr. Linick entered into four agreements relating to the ‘761 Application: an “Agreement for the Transfer of Ownership of a Patent Pending,” a “Retainer Agreement for Advice,” a “Non[-]Disclosure and Confidentiality Agreement,” and a “New and Improved Patent Agreement.” (Def. Ex. 17-20).

165. By the 1997 “Agreement for the Transfer of Ownership of a Patent Pending,” Mr. Linick assigned the ‘761 Application (which became the ‘558 Patent) to Bofors in return for “good and valuable consideration consisting of the ‘Retainer Agreement for Advice.’” (Def. Ex. 17).

166. Under the 1997 “Retainer Agreement for Advice,” Bofors agreed to pay “advance royalties of $37,500 per quarter” to be credited against any royalties due under the 1995 “Agreement for the Transfer of Ownership of Patents” for a period of up to 10 years, unless earlier terminated. (Def. Ex. 18).

167. The 1997 “Non[-]Disclosure and Confidentiality Agreement” contained no terms relating to compensation due to Mr. Linick. (Def. Ex. 17).

168. Mr. Linick has not received any royalty payments from Bofors. (Def. Ex. 100, Ans. to Interrog. Nos. 2 & 3).

169. Mr. Linick has no records establishing any sales under the Bofors Agreements. (Def. Ex. 100, Ans. to Interrog. No. 3).

170. Mr. Linick has no records of his costs relating to the performance of the contracts with Bofors.

171. Mr. Linick, however, testified that he had "a lot of expenses" in performing the Bofors contracts. (Def. Ex. 76 at 138:4-7).

### B. SALES OF PRODUCTS BASED ON THE APPLICATIONS AT ISSUE

172. Mr. Linick did not and would not try to sell the technology in the '215, '614 or '615 applications that are subject to the secrecy order to Bofors. (Def. Ex. 77 at 161:11-163:14).

173. According to Mr. Linick, he would not have sought to license the technology to Bofors because he "didn't think it would be a good idea to come and say what you have we can do a lot better on, but it's going to take a lot more money and so on and so forth." (Def. Ex. 77 at 161:11-163:14).

174. Having licensed the '609 and '558 patents to Bofors in 1995, Mr. Linick did not believe that Bofors would be likely to buy another group of patents at additional cost to Bofors. (Def. Ex. 77 at 161:11-163:14).

### C. PROVISION OF SERVICES TO INDIA

175. If he had received a contract to consult with the Indian Government regarding the manufacture of his Red Rain Technology, Mr. Linick estimated that the cost of all expenses for a three-person team for four weeks would be approximately $ 300,000.00 or $ 25,000.00 per person per week. (Def. Ex. 100, Ans. to Interrog. No. 15).

176. If he had received a contract to consult with the Indian Government regarding the manufacture of his Red Rain Technology, Mr. Linick estimated that Mr. Scott would have to travel two times to provide legal services, at a cost to Mr. Linick of approximately $500,000.00. (Def. Ex. 100, Ans. to Interrog. No.16).

### D. THE PCT APPLICATION AND FOREIGN PATENT RIGHTS

177. Mr. Linick filed a Patent Cooperation Treaty Application, No. PCT/US02/023879 contemporaneous with the filing of the '215 Application. (Linick Ans. to Interrog. No. 9).

178. The PCT Application was substantially the same as the '215 Application.

179. Mr. Linick asserts that he was "forced to abandon the PCT application and thus indicated to the U.S. Patent and Trademark Office on September 19, 2002 that no fees would be paid in furtherance of this international application. (Def. Ex. 100, Ans. to Interrog. No. 9).

180. Mr. Linick's assertion regarding the forced abandonment of the PCT Application is not borne out by the record of the '215 Application. The Secrecy Order imposed on the '215 Application required only that the Linick notified the PTO about the pending PCT application, not that he abandon the application.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN FARGO
Director

OF COUNSEL:

KATE P. RYZOC
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

_s/Gary L. Hausken_
GARY L. HAUSKEN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

September 26, 2011

Attorneys for the United States