# In the United States Court of Federal Claims

No. 10-635C

(Filed Under Seal:  April 5, 2012)

(Reissued for Publication:  April 13, 2012)

************************************ *
                                     *
                                     *
JAMES M. LINICK,                     *
                                     *
                                     *          Invention Secrecy Act, 35 U.S.C. §§
                  Plaintiff,         *          181-86 (2006); Claim for Just
                                     *          Compensation for Damage Caused
                                     *          by Secrecy Order; Proof of Actual
    v.                               *          Damage; Proof of Causal Connection
                                     *          Between Secrecy Order and Alleged
                                     *          Damage.
THE UNITED STATES,                   *
                                     *
                  Defendant.         *
                                     *
************************************ *

*Thomas J. Scott*, *Jr.*, with whom was *April E. Weisbruch*, Goodwin Procter LLP, Washington, DC, for Plaintiff.

*Gary L. Hausken*, with whom were *Tony West*, Assistant Attorney General, *John Fargo*, Director, and *Kate P. Ryzoc*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER[1]

WHEELER, Judge.

    Plaintiff, James M. Linick seeks compensation in the amount of $2.5 million for damages allegedly resulting from secrecy orders the Government imposed on three of his patent applications.  Compl. ¶¶ 20-21 (Sept. 22, 2010).  The secrecy orders, which remain in effect, prohibit Mr. Linick from disclosing the contents of his patent applications to unauthorized

---

[1] The Court issued this decision under seal on April 5, 2012 and invited the parties to submit proposed redactions of any information covered by the Government's patent secrecy orders by April 12, 2012.  On that date, counsel for the parties submitted to the Court a joint filing proposing two minimal redactions. The Court has incorporated the parties' proposed redactions, which are indicated by brackets and three asterisks, [***].

individuals.  See PX 48 at 2067-69; PX 64; PX 65.  By virtue of this prohibition, Mr. Linick claims that the secrecy orders interfered with his ability to market and sell the technology in his patent applications.  Pl.'s Br. 29, 35-36 (Dec. 19, 2011).  Mr. Linick brought this action under 35 U.S.C. § 183 (2006), which grants a patent owner the right to seek "just compensation" for damage caused by a secrecy order.  As set forth below, the Court finds that Mr. Linick is not entitled to relief because he failed to show any actual damage or a causal connection between the secrecy orders at issue and the damage he is claiming.

Background

Mr. Linick is a semi-retired professional engineer, who holds at least one Swiss patent and nine United States patents.  See Stips. 1-3.[2]  Of these ten patents, the Swiss patent and four of the U.S. patents relate to Trajectory Correctible Munitions ("TCMs"), or munitions fitted with technology to ensure greater accuracy.  See JXs 1-5; Tr. 38-39 (Linick).[3]  Likewise, the three patent applications at issue—i.e., those under secrecy orders—all relate to TCMs.  See PX 48; PX 65; PX 66.

The first of these applications, serial number 10/071,215 ("the '215 application"), claims a method for determining the [***] orientation of munitions moving through space (hereinafter "the vertical reference system").  See PX 48 at 2085.  Mr. Linick claims that the '215 application is an improvement on his earlier patents related to TCMs.  Stip. 13.  The other two applications subject to secrecy orders, serial number 10/584,614 ("the '614 application") and serial number 10/584,615 ("the '615 application"), are related "divisional" applications of the '215 application.  See PX 64 at 2299; PX 65 at 2403.  The '614 application claims [***] a cargo round that Mr. Linick refers to as "Red Rain."  PX 64 at 2308; see also Tr. 58-61 (Linick).  The '615 application claims a "trajectory correction mechanism," including an "impulse motor" (hereinafter "the impulse motor system").  PX 65 at 2428.

Mr. Linick filed the '215 application on February 11, 2002.  Stip. 13.  Based upon a recommendation from the U.S. Army Armament Research Development and Engineering Command ("ARDEC"), the U.S. Patent and Trademark Office ("USPTO") imposed a secrecy order on the '215 application on August 14, 2002.  Stip. 16; PX 48 at 2067.  The order stated that the '215 application would be classifiable at the level of "confidential" and provided that "[t]he subject matter of this application may not be published or disclosed to any person except as specifically authorized herein or subsequently authorized by written modification of this Secrecy

---

[2] Specifically, Mr. Linick's patents include:  (1) Swiss Patent No. 674,587, filed May 8, 1987 (JX 5 at 0371); (2) U.S. Patent No. D247,615, filed Jan. 21, 1976, (DX 1 at 1); (3) U.S. Patent No. 4,407,464, filed July 27, 1981, (DX 2); (4) U.S. Patent No. 4,453,087, filed July 27, 1981 (DX 3); (5) U.S. Patent No. 4,679,748, filed June 25, 1984 (DX 4); (6) U.S. Patent No. 4,886,330, filed June 30, 1987 (DX 5); (7) U.S. Patent No. 5,131,602, filed June 13, 1990 (JX 1); (8) U.S. Patent No. 5,647,558, filed May 1, 1995 (JX 2); (9) U.S. Patent No. 5,988,562, filed Nov. 5, 1997 (JX 3); and (10) U.S. Patent No. 6,722,609, filed Feb. 13, 1998 (JX 4).

[3] Throughout this opinion, "Tr." refers to the transcript of the trial in this case, held October 12-14, 2011 at the National Courts Building in Washington, DC.

Order granted by the Commissioner of Patents & Trademarks." PX 48 at 2067. In addition, the order prohibited the filing of foreign patent applications without the USPTO's prior approval. See id. at 2069. On December 11, 2007, the USPTO issued a Notice of Allowability[4] on the '215 patent application but withheld issuance of the patent application due to the secrecy order. Stip. 17; see also PX 48 at 2061-62.

On February 6, 2008, Mr. Linick filed the '614 and '615 applications. Stip. 14; see also PX 64 at 2299; PX 65 at 2403. The USPTO imposed secrecy orders on both of these applications on June 20, 2008. Stip. 18; see also PX 64; PX 65. Like the secrecy order covering the '215 application, the secrecy orders for the '614 and '615 applications prohibit disclosure to unauthorized individuals. See PX 64; PX 65. Unlike the '215 order, however, the orders covering the '614 and '615 applications include permits for foreign filing. See PX 64; PX 65. The USPTO issued Notices of Allowability on the '614 and '615 applications on January 4, 2011 and October 7, 2009, respectively, but withheld issuance of the patent applications due to the secrecy orders. Stips. 19, 21.

On March 12, 2008, pursuant to the Invention Secrecy Act, 35 U.S.C. § 183, Mr. Linick submitted an administrative claim to the Secretary of the Army and the Commanding General of the Army Military Command for just compensation due to the imposition of the secrecy order on his '215 application. See PX 100. The Army did not respond substantively to Mr. Linick's administrative claim until February 2011. See PX 122; PX 124. In the meantime, on February 22, 2010, counsel for Mr. Linick filed a Rule 27 Verified Petition in this Court to preserve Mr. Linick's testimony on account of his failing health. See No. 10-118M, Dkt. No. 1. The Court granted Plaintiff's request, see id., Dkt. No. 6, allowing Mr. Linick to perpetuate his own testimony regarding the harm he claims to have suffered as a result of the secrecy orders. Mr. Linick's attorney and government counsel conducted an oral examination of Mr. Linick in the presence of the Court on April 21-22, 2010.

Having failed to receive a substantive response from the Army, Mr. Linick commenced this action on September 22, 2010, seeking just compensation under § 183 for the injury he allegedly suffered as a result of the three secrecy orders. No. 10-635C, Dkt. No. 1. The Army finally responded to Mr. Linick's administrative claim, issuing a tentative denial of his claim on February 8, 2011, see PX 122, followed by a final denial on March 3, 2011, see PX 124. The Court held a three-day trial in this case on October 12-14, 2011 at the National Courts Building in Washington, DC.

<u>Discussion</u>

Section 181 of the Invention Secrecy Act ("the Act") authorizes the Commissioner of Patents ("the Commissioner"), upon the recommendation of a specified federal agency, to order that an invention be kept secret and to withhold the publication of an application or the grant of a patent if publication or disclosure "might . . . be detrimental to the national security." 35 U.S.C. § 181. To justify the imposition of a secrecy order, the Government itself need not have any interest in the invention. Hornback v. United States, 36 Fed. Cl. 552, 554 (1996). The only

---

[4] The USPTO issues a Notice of Allowability or Notice of Allowance when, upon examination, it appears that an applicant is entitled to a patent under the law.

requirement under § 181 is that the appropriate government agency determine that divulgence might harm national security.  Id.; § 181.[5]  After the Commissioner orders an invention to be kept secret, § 186 of the Act makes it a criminal offense to disclose the invention, or material information about the invention, without authorization.

For a patent owner who has been affected by a secrecy order, § 183 of the Act provides a means of relief, granting the owner the right to seek just compensation "for the damage caused by the order of secrecy."  The mere existence of a secrecy order does not give rise to damages. Weiss v. United States, 146 F. Supp. 2d 113, 127 (D. Mass. 2001), aff'd, 37 F. App'x. 518 (Fed. Cir. 2002).  Instead, "[s]omething more must be shown."  Id.  As this Court has held, to recover under § 183, it is not enough for a plaintiff to claim speculative damage; instead, recovery requires proof of "'actual damage'" or "'concrete evidence of damages.'"  Constant v. United States, 617 F.2d 239, 244 (Ct. Cl. 1980) ("Constant I") (quoting Patent Disclosure: Hearings on H.R. 4687 Before Subcomm. No. 3, H. Comm. on the Judiciary, 82nd Cong. 32 (1951)); Lear Siegler, Inc. v. United States, 225 Ct. Cl. 663, 665 (1980).

This Court first addressed the issue of proof of damage under § 183 in a dispute between inventor, James N. Constant and the United States.  Constant v. United States, 1 Cl. Ct. 600 (1982) ("Constant II"); Constant I, 223 Ct. Cl. 148.  In Constant II, the Court held that Constant could not recover under § 183 because he had failed to prove actual damages.  1 Cl. Ct. at 607. After taking note of Constant's uncorroborated testimony that the secrecy order at issue impeded his ability to market his invention, the Court concluded:

> These conjectural and speculative claims must be rejected in toto. Apart from plaintiff's own conclusory ipse dixit testimony, the record is devoid of any probative evidence tending to show that the companies alleged to be potential 'customers' were interested in plaintiff's unsolicited proposals, or that the secrecy orders interfered with plaintiff's attempts to sell his system to these various companies or agencies.

Id.  The Court also noted that Constant never petitioned the Commissioner of Patents for a modification of the secrecy order to allow him to disclose the contents of his application to unauthorized persons.  Id.

Subsequent to the Constant decisions, the courts have reinforced the view that recovery under § 183 requires proof of actual damage.  In Lear Siegler, Inc. v. United States, 225 Ct. Cl. 663 (1980), the plaintiff argued that the imposition of a secrecy order on his patent automatically entitled him to relief under § 183.  Id. at 665.  In rejecting the plaintiff's argument, the Court explained that section "183 requires plaintiff [to] prove an injury (entitlement) and damages

---

[5] John F. Moran, lead patent attorney at Picatinny Arsenal in New Jersey, testified at trial that the Army had no interest in developing Mr. Linick's inventions but determined they should be kept secret due to national security concerns.  Tr. 587 ("[I]t's not a question of the Army's interest, it's a question of national security.").  He explained that national security concerns could arise if information regarding Mr. Linick's inventions got into the wrong hands.  Id.

(quantum)." Id. Because the plaintiff's pleadings did not contain such proof, the Court denied the plaintiff's motion for summary judgment. Id.

Similarly, in Weiss, 146 F. Supp. 2d at 126-27, the plaintiff claimed that the Government, by imposing secrecy orders on his invention, confiscated his right to license his technology and prevented him from exploiting his invention outside the United States. In rejecting the plaintiff's claim, the Court noted that the plaintiff had "produced evidence of a bright idea, for which he received a patent, but . . . ha[d] not produced evidence of a *valuable* idea." Id. at 128 (emphasis in original). The Court explained:

> There is no evidence that [the plaintiff] ever licensed his patent or exercised his right to exclude. There is no evidence that anyone, including [the plaintiff], ever practiced or will practice the invention. There is no evidence of any actual or potential customers, domestic or foreign, either today or at the time of the secrecy orders.

Id. The Court added that not only had the plaintiff failed to produce evidence tending to show damage, but he also failed to show a causal connection between the secrecy orders and the alleged damage. Id. In light of these failings, the Court granted the Government's motion for summary judgment. Id. at 129.

As in the aforementioned cases, Mr. Linick has failed to adduce proof of actual damage resulting from the subject secrecy orders. Mr. Linick's principal contention is that the secrecy orders "interfered with [his] preferred and established method of doing business," thus entitling him to just compensation under § 183 for the profits he would have made if not for the secrecy orders. Pl.'s Br. 3, 13, 15 (Dec. 19, 2011). Mr. Linick explains that in the past, he was able to interest domestic and foreign companies by revealing the contents of his patents and patent applications. Id. at 21. Based upon these past successes, he asks the Court to "infer" that he would have marketed and sold his technology in this same manner "in the absence of any Secrecy Order." Id.

The Court finds Mr. Linick's claims highly speculative and the evidence insufficient to prove that Mr. Linick suffered actual damage on account of the secrecy orders. As set forth below, Mr. Linick has shown that he successfully sold patents to Bofors of Sweden ("Bofors") in 1995 and 1997. Thereafter, however, Mr. Linick has presented no proof beyond his own assertions that his TCM technology was of real interest to any customer, whether it be the U.S. Government, domestic or foreign defense contractors, or any foreign government.

A.  Mr. Linick's Agreements with Bofors

In 1995 and 1997, Mr. Linick entered into a series of agreements with Bofors related to his TCM technology. Under an "Agreement for the Transfer of Ownership of Patents," dated February 20, 1995, Mr. Linick transferred to Bofors ownership of his Swiss patent and his '602 patent for a lump sum payment of $2 million, as well as royalties and commissions on the sale of products incorporating his TCM technology. Def.'s Br. 10 (Dec. 19, 2011); see also JX 9. Also on February 20, 1995, the parties concluded a "Marketing Assistance Agreement," according to

which Mr. Linick agreed to serve as an independent adviser and assist Bofors in marketing products utilizing TCM technology.  See JX 8; Tr. 49-50 (Linick).  In exchange for Mr. Linick's assistance, Bofors agreed to pay him up-front royalties of $25,000 per quarter, plus out-of-pocket expenses of up to $5,000 per month.  JX 8 at L0840, L0842.  Mr. Linick testified that the marketing agreement with Bofors lasted approximately one or two years.  Tr. 51; see also JX 11 (indicating that the agreement would run for three years, unless either of the parties terminated the agreement upon three months' notice).

On February 20, 1997, Mr. Linick and Bofors executed additional agreements whereby Mr. Linick transferred to Bofors ownership of the patent application that became the '558 patent, see JX 12, and agreed to continue to advise Bofors, see JX 13.  In return for Mr. Linick's continued assistance, Bofors agreed to pay him "advance royalties" of $37,500 per quarter for ten years to be credited against Bofors' obligation to pay Mr. Linick royalties on sales of TCM products under the 1995 agreement.  See JX 13.  It appears that Bofors never paid Mr. Linick any royalties under the 1995 and 1997 agreements.[6]  See DX 100 at 2-3 (Pl.'s Answers to Interrog. Nos. 2-3); see also DX 22; DX 115; DX 116.

Mr. Linick uses his two contracts with Bofors as a basis to claim that "$2.5 million represents[] [his] best assessment of the 'actual damage' caused as a result of the imposition of the Secrecy Order on the '215 application and related divisional applications."  Pl.'s Br. 34 (Dec. 19, 2011).  Mr. Linick contends that after the sales to Bofors, he continued to improve his TCM technology and that the '215 application and related divisional applications represent "his most sophisticated technology."  Id. at 9, 29.  In light of his sales to Bofors and the alleged improvement of his technology, he maintains that "it is not unreasonable to assume that one of the buyers . . . would have been willing to make a financial commitment to Linick at some time between 2002 and the present."  Id. at 34.

The reasonableness of this assumption is belied, however, by the fact that between 1997 and 2002—when Mr. Linick was free to market his TCM technology unencumbered by a secrecy order—Mr. Linick failed to develop any significant interest in his TCM technology.  Instead, as in Weiss, 146 F. Supp. 2d at 128, the communications during that time demonstrate that while Mr. Linick may have had a bright idea, he did not have a valuable one.

B.  Mr. Linick's Marketing Efforts Prior to Imposition of the '215 Secrecy Order

Before the Government imposed a secrecy order on Mr. Linick's '215 application (on August 14, 2002), he attempted to market his vertical reference system and his impulse motor system to the U.S. Army.  See Pl.'s Br. 6-8 (Dec. 19, 2011); Tr. 730-31 (Scott).  Specifically, in July of 1999, Mr. Linick, along with his attorney and representative, Mr. Scott, met with personnel at Picatinny Arsenal, including Vincent Marchese, the Chief of the Guided Munitions Branch at Picatinny Arsenal, Modesto Barbarisi, and John Moran, a patent lawyer for Picatinny Arsenal.  Tr. 678-80 (Marchese); see also Pl.'s Br. 6-8 (Dec. 19, 2011).  Mr. Marchese testified

---

[6] Between 1998 and 2005, Mr. Linick, often through his attorney, Thomas Scott, asserted that he was due such royalties, but Bofors continually represented that he was not.  See DX 22; DX 28; DXs 48-50; DX 116; DX 118.  This disagreement appears to have resulted in a somewhat acrimonious end to the working relationship between Mr. Linick and Bofors.  See DX 48; DX 61; DX 118.

that he "wasn't really interested in the vertical reference system" because other parts of the Army were working on such a system. Tr. 680. Likewise, Mr. Marchese testified that he was not interested in the impulse motor system because "it posed . . . a safety risk for the green suiters." Tr. 681. He explained that to change the trajectory of the projectile, the impulse motor would eject heavy metal pieces over the heads of friendly troops, thus endangering their safety. Tr. 681-82 (Marchese). In addition, Mr. Marchese testified that Picatinny Arsenal had no mechanism for buying Mr. Linick's technology because there was no "formal requirement" for such munitions. Tr. 685-86. Although Mr. Scott sent Mr. Marchese a letter and email following the July 1999 meeting, Mr. Marchese remembered no further communications with Mr. Scott or Mr. Linick. See Tr. 696-700 (Marchese); see also Tr. 735 (Scott) (testifying that he did not recall whether he ever again spoke with Mr. Marchese).

Before imposition of the '215 order, Mr. Linick also attempted to market his TCM technology to defense contractors in the United States. In a July 26, 1999 letter, Mr. Scott, on behalf of Mr. Linick, wrote to Minnesota-based Alliant Techsystems, Inc. ("Alliant") and included an attachment briefly explaining Mr. Linick's TCM inventions. See JX 21. In an August 9, 1999 letter, a counsel for Alliant responded, saying that the company "is not interested in these inventions." JX 25.

In similar letters dated July 7, 2000 and July 10, 2000, Mr. Scott wrote to representatives of Talley Industries, Inc. ("Talley") in Arlington, Virginia, attempting to market Mr. Linick's TCM technology. See JX 31; JX 32. Although Mr. Linick testified that he met with Talley representatives, there is no evidence that Talley exhibited any serious interest in his inventions. See Tr. 92-95 (Linick).

In addition, Mr. Linick testified that in 2001, he met with representatives of Lockheed Martin ("Lockheed") in Orlando, Florida and explained his vertical reference system. Tr. 87-88. He testified that the meeting did not last longer than an hour and that he had no further meetings with Lockheed after that initial meeting. Tr. 88-89.

Mr. Scott, on behalf of Mr. Linick, attempted to market Mr. Linick's TCM technology to Raytheon before and after the USPTO imposed the '215 secrecy order. See JX 39; JX 40; JX 44. Emails from Mr. Scott to a Raytheon representative indicate that Mr. Scott had the opportunity to communicate with Raytheon concerning Mr. Linick's TCM technology, but they do not reveal that Raytheon ever demonstrated an interest in the technology. See id.; see also Tr. 95-96 (Linick). In an October 28, 2002 email, Mr. Scott notes that he is unable to share information about the contents of the '215 application because it is under secrecy order, but there is no indication in the email or otherwise that Raytheon sought to elicit such information. See JX 44, ¶ 2.

Beginning in 2000, Mr. Linick also attempted to market his TCM technology to defense contractors outside the United States. Specifically, in September 2000, Mr. Linick sent information about his TCM technology to Mr. Fredi Sandau of Rheinmetal GmbH ("Rheinmetal") in Germany. See JX 33; JX 34. According to Mr. Linick, he followed up in a telephone conversation with Mr. Sandau, during which Mr. Sandau stated that Rheinmetal was

not "interested in going in that direction" but recommended that Mr. Linick contact DIEHL Munitionssysteme GmbH & Co. KG ("DIEHL"), also in Germany.  Tr. 97-98 (Linick).

Sometime between the end of 2000 and March of 2001, Mr. Linick met with representatives of DIEHL in Nuremberg, Germany regarding his vertical reference system and his impulse motor system.  See Tr. 98-102; JX 36.  Mr. Linick subsequently sent DIEHL a proposal for future cooperation, see JX 36, and planned to travel to Nuremberg for a second meeting, Tr. 103 (Linick).  Shortly before Mr. Linick was scheduled to depart for the second meeting, DIEHL canceled the meeting, and Mr. Linick never heard from DIEHL again.  Id.

Finally, in July 2002, Mr. Scott corresponded with Mr. Forrest R. Lindsey, Senior Engineer with the Marine Corps Warfighting Laboratory.  See JX 43.  In response to an email from Mr. Scott explaining Mr. Linick's TCM technology, Mr. Lindsey raised several concerns with Mr. Linick's inventions and stated that "[w]hile Mr. Linick's concepts have merit, I still don't understand how he overcomes some of these engineering challenges to implementing his ideas."  Id.  Mr. Linick testified that he never responded to Mr. Lindsey's concerns or attended any follow-up meetings because he was ill during that time.  Tr. 82-83 (Linick).

The above record demonstrates that despite multiple attempts to market and sell his TCM technology before imposition of the '215 secrecy order, Mr. Linick's efforts did not garner any serious prospects.  Picatinny personnel displayed no interest in Mr. Linick's vertical reference system or impulse motor system, as other parts of the Army were working on a version of the former, and the latter posed serious safety risks.[7]  See Tr. 680-81 (Marchese).  Likewise, Mr. Linick's attempts to market his technology to domestic and foreign defense contractors met with no serious or prolonged interest.  Finally, due to Mr. Linick's health at the time, he was unable to follow-up with Mr. Lindsey, who voiced multiple concerns with Mr. Linick's technology.  See JX 43; Tr. 82-83 (Linick).  In sum, the record shows that between 1997 and August 2002, Mr. Linick had no actual or even prospective customers interested in his inventions.

C. Mr. Linick's Marketing Efforts After Imposition of the '215 Secrecy Order

As with Mr. Linick's efforts prior to imposition of the '215 order, his efforts after imposition of the order resulted in no significant interest.  Notably, aside from Mr. Linick's self-serving testimony, there is nothing in the record to indicate that this lack of interest was caused by imposition of the secrecy orders.

After imposition of the secrecy order on the '215 application, Mr. Linick continued to market his inventions, but he directed his marketing efforts at courting foreign governments.  In

---

[7] Mr. Linick contends that he could have addressed Mr. Marchese's safety concerns and that "Mr. Marchese never actually gave [him] a fair chance at successfully marketing his TCM inventions to the United States at Picatinny Arsenal."  Pl.'s Br. 7-8 (Dec. 19, 2011).  In addition to being highly speculative, Mr. Linick's contentions are immaterial.  Even if Mr. Linick could have addressed Mr. Marchese's safety concerns, Picatinny had no means by which to buy Mr. Linick's technology.  See Tr. 685-86 (Marchese).  Moreover, for purposes of determining damage, it matters only that Picatinny personnel declined to pursue Mr. Linick's inventions; it does not matter why they declined to do so.

all of his interactions with foreign governments, Mr. Linick maintains that he strictly adhered to the provisions of the secrecy order and accordingly did not disclose specific details of his '215 application.  See Pl.'s Br. 15 (Dec. 19, 2011).

In 2004, Mr. Linick met with two officers from the Japanese Department of Defense in Japan.  Tr. 106, 109 (Linick).  Mr. Linick testified that the Japanese were interested in learning more about his inventions, Tr. 108; Dep. 101,[8] but that he did not bring any materials with him to the meeting, Dep. 102 ("I didn't have anything.  All I had was a business card.  Nothing else. That really, really put him in a bad mood, the full Colonel.").  In addition, Mr. Linick testified that "[t]he meeting was difficult because nobody spoke English very well and I did not speak Japanese."  Tr. 106; see also Dep. 98 ("[T]he people that I dealt with in Japan didn't speak English hardly at all.").  Mr. Linick explained further, "I couldn't disclose with them any features of anything because I didn't have that level of communication with them or ability to do that."  Tr. 107.  Mr. Linick testified that a Lieutenant Colonel Hirano told him that the Japanese Department of Defense does not buy patents but that private Japanese companies do.  Tr. 108. According to Mr. Linick, Colonel Hirano indicated that he would be in touch with Mr. Linick shortly, but Mr. Linick never heard from him again.  Tr. 109 (Linick).

Also in 2004, Mr. Scott sent emails containing a summary of Mr. Linick's inventions to two acquaintances, allegedly connected to the Israeli government.  See JXs 45-46.  Mr. Scott testified that neither individual responded, as one left his position and was unable to send the information to the Israeli government, and the other was in the midst of a serious health procedure.  See Tr. 736-38.

Mr. Linick testified that in 2006, he also spoke on the telephone with officials of the Thai government, a married couple, both of whom were colonels in the Thai army.  See Dep. 87-88; Tr. 115.  During Mr. Linick's deposition, he stated that they were interested only in having Mr. Linick teach courses in Thailand, that he declined, and that he never heard from them again. Dep. 88.  When asked at trial whether the Thai military was interested at all in developing his invention, Mr. Linick responded, "[n]ot that I knew of."  Tr. 116.

In or around May 2006, Mr. Linick testified that he also traveled to Delhi, India, where he met with two engineers who worked with the Indian Department of Defense.  Tr. 110.  The meeting lasted no more than two hours.  Dep. 90; see also Pl.'s Br. 16 (Dec. 19, 2011). According to Mr. Linick, during the meeting, the engineers expressed an interest in a "gyro pack."  Tr. 111-12 (Linick).  After the meeting, Mr. Linick wrote them a letter saying he could work with them on the gyro pack, but he never heard from them again.  Tr. 113 (Linick).  During his deposition, Mr. Linick also noted that during the meeting, he had asked the engineers what type of GPS technology they had in India.  Dep. 91.  Mr. Linick stated that once he brought up the subject of their GPS technology, "the conversation was over.  They wouldn't talk to me at all."  Dep. 91-92.

In 2010 and 2011, Mr. Linick corresponded and met with officials from the South Korean government.  Pl.'s Br. 17 (Dec. 19, 2011).  Specifically, Mr. Linick testified that he met with a

---

[8] "Dep." refers to the transcript of Mr. Linick's deposition taken April 21-22, 2010.  The Court received this deposition into evidence.  See Tr. 612.

Colonel Choi connected with the Korean military and embassy. Tr. 117. "[T]he meeting wasn't long," but Mr. Linick explained his TCM technology and said that it seemed "very interesting" to them. Tr. 118. Mr. Linick met with Korean officials a second time, but they did not ask any questions, "[s]o that meeting went kind of fast too." Tr. 119 (Linick). After that second meeting, Mr. Linick heard nothing further from the Korean government. Tr. 118-19 (Linick).

On behalf of Mr. Linick, Mr. Scott sent a letter to the U.S. Embassy of the People's Republic of China ("PRC"), dated March 28, 2011, inquiring as to whether the PRC would have any interest in Mr. Linick's TCM technology. JX 58. Mr. Linick never received a response from the Chinese government. See Tr. 121 (Linick); Tr. 738 (Scott).

The above events show that between 2002 and 2011, Mr. Linick failed to engender any appreciable interest in his technology. Mr. Linick practically concedes as much but states that he "continuously encountered difficulty garnering sufficient interest in the first instance 'because he could not disclose the information that was under secrecy' to prospective buyers." Pl.'s Br. 18 (Dec. 19, 2011) (quoting Tr. 742 (Scott)). But, other than assertions by Mr. Linick and Mr. Scott to that effect, Mr. Linick has offered no evidence supporting the position that the secrecy order inhibited Mr. Linick from generating interest in his technology.

After issuance of the secrecy order, Mr. Scott testified that Mr. Linick "was able to disclose essential elements of his inventions without seeking modification of the secrecy order." Tr. 740. This testimony suggests that Mr. Linick's failure to engender interest in his technology was not due to the constraints of the secrecy order. More importantly, however, aside from the self-serving testimony of Mr. Linick and Mr. Scott, Mr. Linick cannot point to one piece of evidence indicating that any of the foreign governments declined to pursue his technology because of the secrecy order. As in Constant II, 1 Cl. Ct. at 605, no correspondence from any foreign government cited the secrecy order as an element affecting its decision not to do business with Mr. Linick, and Mr. Linick did not call one witness from any of these governments to corroborate his testimony that the secrecy order interfered with his efforts to market and sell his technology.

Rather than the secrecy order, the record shows that there were other causes for Mr. Linick's failure to interest foreign governments in his inventions. Mr. Linick's own testimony reveals that the meeting with the Japanese officials was unsuccessful because of the language barrier, Tr. 106 (Linick), and the meeting with the Indian officials was unsuccessful because Mr. Linick raised the topic of GPS technology, Dep. 91-92. Likewise, Mr. Linick testified that the Thai officials were interested in having Mr. Linick serve as a teacher but were never interested in his technology. Dep. 88; Tr. 116 (Linick). The Israeli and Chinese officials never responded to Mr. Linick's overtures,[9] Tr. 736-38 (Scott), and, despite an initial response from the Korean officials, Mr. Linick's meetings with them were short and whatever initial interest may have arisen quickly died, Tr. 118-19 (Linick). Given these alternative explanations and the complete

---

[9] The Court notes that even if the PRC had shown interest in Mr. Linick's inventions, export control laws would have precluded Mr. Linick from selling his technology or services to the PRC. See 54 Fed. Reg. 24539 (June 7, 1989) (suspending as of June 5, 1989, all licenses and approvals to export defense articles and defense services from the U.S. to the PRC).

lack of reference to the secrecy order, the Court concludes that Mr. Linick has not shown a causal connection between the secrecy order and the harm he alleges.

Moreover, the Court notes that if the secrecy order was, in fact, inhibiting Mr. Linick's marketing efforts, he could have sought to modify the order.  See 37 CFR § 5.5 (providing a means to seek a modification to disclose the contents of a secrecy order).  Mr. Linick contends that the secrecy order prevented him from forming meaningful business relationships, while at the same time arguing that the lack of meaningful business relationships inhibited him from seeking to modify the secrecy order.  Tr. 726, 743 (Scott).  Mr. Linick cannot have it both ways.  If it were so clear that the secrecy order was stifling his business, then Mr. Linick should have sought to modify the secrecy order.  After all, if Mr. Linick had experienced no difficulty attracting business with the secrecy order in place, then he would have had no incentive to seek any modification of the secrecy order.

<u>Conclusion</u>

The Court concludes that Mr. Linick has failed to show any entitlement to compensation.  He has presented nothing more than speculative claims that because he successfully sold his technology in the past, he could have sold his current technology if not for the secrecy orders at issue.  Other than his *ipse dixit* testimony, however, the record is devoid of evidence tending to show that Mr. Linick suffered any actual damage or that the secrecy orders at issue caused the damage he alleges.  Accordingly, the Court enters judgement for the Government.

This decision is issued under seal.  On or before April 12, 2012, prior to publishing this decision, the parties shall identify any proposed redactions for information that should not be disclosed to the public due to the existence of the secrecy orders.  If there are no proposed redactions, each party should submit a notice to the Court indicating that fact.

No costs.

IT IS SO ORDERED.

<u>s/Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge